IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| LaVertis Stewart, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12 C 50273 |
| | ) | |
| vs. | ) | |
| | ) | |
| Wexford Health Sources, Inc., et al., | ) | Judge Philip G. Reinhard |
| | ) | |
| Defendants. | ) | |

## ORDER

Defendants' motion for summary judgment [406] is granted. Judgment is entered in favor of defendants Kenneth Blickenstaff, in his capacity as personal representative of the Estate of Antreas Mesrobian, M.D., deceased, Arthur Funk, M.D., Wexford Health Sources, Inc. and against plaintiff.

## STATEMENT-OPINION

Plaintiff, LaVertis Stewart, brings this action against defendants, Kenneth Blickenstaff, in his capacity as personal representative of the Estate of Antreas Mesrobian, M.D., deceased, Arthur Funk, M.D., Wexford Health Sources, Inc. ("Wexford"), and Wayne Steele, pursuant to 42 U.S.C. § 1983 claiming defendants violated his constitutional right not to be subjected to cruel and unusual punishment. Plaintiff contends defendants were deliberately indifferent to his serious medical needs when they refused to grant him exemptions from wearing the "black box" restraint device on numerous occasions when he was taken outside the institution on medical or court writs. Blickenstaff, Dr. Funk, and Wexford jointly move for summary judgment [406]. Steele separately moves for summary judgment [412].[1]

Plaintiff is an inmate in the custody of the Illinois Department of Corrections ("IDOC") and has been incarcerated at IDOC's Dixon Correctional Center ("Dixon") since 2003. Wexford is contracted by IDOC to provide medical treatment to inmates at Dixon. Pursuant to IDOC policy, black box restraints are used on all inmates who leave Dixon unless an inmate has a medical exemption. A black box restraint is a set of normal handcuffs with a black box over the link between the cuffs. Prisoners normally wear the black box with one palm facing up and the other palm facing down – the "twisted wrist position". The decision to give a black box exemption is a clinical decision made by a medical provider at the prison based on the individual

---

[1] Steele's motion is disposed of by a separate order entered today.

1

patient, the patient's circumstances, and medical necessity. However, the warden and security staff can override a medical provider's decision to give a black box exemption to an inmate.[2]

Plaintiff has several medical conditions that require ongoing care, including hepatitis C, cirrhosis of the liver, carpal tunnel, lateral epicondylitis (tennis elbow), arthritis, shoulder bursitis, shoulder impingement, shoulder capsulitis/arthritis, arthritis bone spurs, and tendinitis. He receives treatment for these conditions in the medical unit at Dixon and has received treatment from outside specialists as well. According to plaintiff, wearing the black box in the twisted wrist position causes pain in his shoulders and wrists both while wearing the black box and in the days after. According to the deposition testimony of Dr. Funk, a claim by an inmate that wearing the black box restraint worsened the inmate's shoulder pain would be a reason for a medical evaluation of the inmate to determine whether a black box exemption was warranted for that inmate. [3]

Prior to his death in January 2010, Dr. Mesrobian served as the medical director at Dixon from December 2008 to October 2009. Plaintiff recalled asking Dr. Mesrobian at various times to take him off the black box because of the pain in his wrists and shoulder. Plaintiff wore the black box on April 22, 2009 while out on a medical writ. On April 24, 2009, Dr. Mesrobian saw plaintiff and wrote in the medical records that plaintiff "does not want to use black box. Claims aggravates shoulder. There is no medical reason for no black box."

On May 5, 2009, plaintiff wore the black box while out on a medical writ. On May 8, 2009, plaintiff saw Dr. Mesrobian for a medical writ follow-up. Dr. Mesrobian prescribed him Motrin (400mg three times daily) at that time to treat the pain in his wrists and shoulders, including swelling.[4] Plaintiff recalls discussing the black box restraints with Dr. Mesrobian on several other unspecified occasions. Every time he saw Dr. Mesrobian he asked for a black box exemption due to his shoulder and wrist issues. Dr. Mesrobian told him he did not think plaintiff's injuries or condition warranted an exemption. During Dr. Mesrobian's tenure as Dixon's medical director he denied all of plaintiff's requests for a black box exemption. On June 4, 2009, plaintiff filed a grievance seeking a black box exemption.

---

[2] Wexford makes this statement in its statement of facts (Dkt # 407, ¶ 12) and plaintiff does not dispute it (Dkt # 422-1, p. 8, response to Wexford's ¶ 12). However, the testimony cited in support is narrower in scope than the statement. Steele testified that the warden could overturn a black box exemption but that he had "never seen a warden overturn a doctor." (Dkt # 407-5, p. 13 [Ex. E, p.50:1-4]). When asked whether he was aware of anyone one else who could override a decision to provide a "no-black-box permit" he responded "[a]gain, I don't think there's anything in there to override a medical person." When asked if he was aware of any times where such a permit was overridden, he responded "[n]o, not in my entire career." (Id.) Dr. Funk testified "security also said they had the discretion to vary the cuffing based on their assumption of need."(Dkt # 407-7, p. 22 [Ex. G p. 84:2-12])

[3] Funk Dep. pp. 61-62 (Dkt. # 407-7, pp. 16-17)

[4] Plaintiff initially claimed Dr. Mesrobian's prescribing Motrin was also a constitutional violation but he did not address this claim in his summary judgment response and therefore has waived it.

Dr. Funk is employed by Wexford and, since 2005, has been its regional medical director for the region that includes Dixon. As regional medical director he is responsible for supervising the medical director at Dixon and, at times, he has provided physician services to inmates there. Dr. Funk saw plaintiff at Dixon several times between September 22, 2011 and August 6, 2012.[5] Dr. Funk has no recollection of discussing the black box restraints with plaintiff on these occasions or at any other time. Plaintiff says in his supplemental statement of facts that he discussed the black box with Dr. Funk at these visits. Plaintiff cites to his deposition testimony to support this statement. In the cited portion, plaintiff testified in his deposition as follows concerning his conversations about the black box with Dr. Funk:

> Q. Do you recall any visits with Dr. Funk where you discussed the Black Box?
> A. Yes.
> Q. And do you remember when that conversation occurred?
> A. No, I don't remember the dates.
> Q. Okay. Was it before or after the May 29th, 2012 issue or incident?
> A. I can't really say. I don't know.
> Q. What do you remember about your conversation with Dr. Funk as it pertains to the Black Box restraints?
> A. I wanted to see an orthopedic and him telling me that he was wanting me to go back to therapy and see how it works. And that he would make a determination after therapy.
> Q. Make a determination whether –
> A. Whether to send me to an ortho.
> Q. Do you remember asking him for a Black Box exemption at that time or any time?
> A. It's possible if I didn't have a Black Box permit at the time.
> Q. Okay, but you can't recall any specific time that you said, 'Dr. Funk, I want my Black Box exemption renewed or entered,' or anything to that effect?
> A. No. It could have been any one of those days.

Dkt # 407-1, p. 29, Dep. pp. 115-16.

Plaintiff also asserts Dr. Funk was aware of plaintiff's pain and repeated requests for a black box exemption because Dr. Funk reviewed grievances at Dixon in 2017 when Dixon had a significant backlog of grievances and, therefore, in his review would have seen plaintiff's grievances that explained his need for a black box exemption. However, the portions of the record cited by plaintiff to support this assertion (Dkt # 407, Ex. J at 65:23-66:7 & Dkt # 407,

---

[5] Dr. Funk saw plaintiff for medical treatment at Dixon on September 22, 2011, October 7, 2011, October 24, 2011, March 5, 2012, June 1, 2012, and July 10, 2012. He saw plaintiff for a medical writ follow-up on August 6, 2012 at which time he diagnosed plaintiff with adhesive capsulitis, a possible rotator cuff tear, shoulder impingement signs and irritable bowel syndrome and requested he be seen by a physical therapist in the hope physical therapy would reduce plaintiff's shoulder pain.

3

Ex. A at 115:4-6, 115:13-19) do not support it. The cited portions of the record contain nothing concerning Dr. Funk's review of grievances at Dixon.

Plaintiff also asserts in his supplemental statement of facts that "[t]here is evidence that Funk directed medical staff to only provide black box exemptions for inmates with broken wrists." However, his citation to the record (his deposition Dkt # 407, Ex. A. at 133:13-33[6]) does not contain any reference to broken wrists. Page 134 of plaintiff's deposition does show him testifying concerning a conversation with Dr. Chamberlain:

> Q. But he said he didn't give you the exemption until March 2017 why?
> A. Because of his orders from Warden Steel, Dr. Funk and Wexford.

Dr. Funk never issued plaintiff a black box exemption.

Plaintiff states in his supplemental statement of facts that several of his "outside medical providers, including Dr. Shaw[7], a doctor at UIC, recommended that Mr. Stewart be given a black box exemption due to his medical conditions. (Doc. 407, Ex. A at 51:22-52:21, 97:14-98:13, Ex. A at Ex. 4)" Dkt # 422, ¶ 15. In his deposition, plaintiff testified about a letter[8] dated January 27, 2009 which he believed was written by Dr. Shaw, a physician in UIC's Department of Hematology and Oncology. Plaintiff testified as follows:

> Q. And it looks like they write in here that they recommended the use of leather belts?
> A. Yes.
> Q. Do you remember having a conversation with them on this particular day?
> A. Yes.
> Q. What do you remember about that conversation?
> A. When Dr. Shaw came in, he asked me how I was doing. And I told him that I was hurting from wearing the Black Box. And that was just so painful.

---

[6] Page 133 only contains 24 lines so "33" must be a typo.

[7] Plaintiff identifies the doctor as "Dr. Shaw" but it may have been "Dr. Shah".

[8] The letter is handwritten and addressed "To Whom It May Concern." The relevant text of the letter is as follows: "This is to state that Mr. Stewart needs bone marrow aspiration/biopsy to evaluate neutropenia. Recommend bone marrow biopsy/aspiration in two weeks on Tuesday @ 12:00 Noon. Please do not give neupogen on Friday before the date of procedure and on the day of procedure. Recommend use of leather belts." At the bottom of the note, Dr. Mesrobian has written that he discussed with the doctor who wrote the note (who plaintiff identifies as Dr. Shaw) plaintiff's request that the restraints "be changed to leather." Dr. Mesrobian's note concerning this discussion says "no absolute medical reason" but it is not clear if this is what the UIC doctor told him or it was Dr. Mesrobian's own conclusion. Dkt. # 437-1, p. 2.

4

> And I believe he asked me was there anything he could do. And I believe that's how it was he asked me if there was anything he could do. And I told him help me get out of the Black Box if I am not mistaken. And then he wrote this.
>
> Q. And it looks like Dr. Mesrobian at least stamped his name at the bottom; right?
> A. Yes.
> Q. Do you remember having any conversations with Dr. Mesrobian about Dr. Shaw's letter in Exhibit 4?
> A. Yes.
> Q. What do you remember about that conversation?
> A. He wasn't very pleased that the oncologist had made that recommendation and that he was the one who decided who would be taken out of the Black Box or given a permit.
> Q. And at that time Dr. Mesrobian did not give you an exemption; correct?
> A. Exactly.

Dkt. # 407-1, p. 25, Dep. pp. 97-98.

In the other portion of his deposition cited in support of paragraph 15 of his supplemental statement of facts, plaintiff testified as follows:

> Q. Has there ever been a time when a physician at UIC asked for you to be released from the Black Box restraints?
> A. Yes.
> Q. Do you know how many times?
> A. No.
> Q. Do you know any particular physicians who asked you to be taken out of the Black Box restraints at UIC?
> A. Yes.
> Q. Do you remember their names?
> A. The oncologist/hematologist, Dr. Quigley, has had them take me out of it to be examined; Dr. Shaw; the doctor that I saw at the gastrointestinal; the doctor that I saw when I had different exams for my lungs; the urologist.
> Q, That's all you can recall at this time?
> A. Yes.
> Q. So there has been at least five doctors on at least five different occasions who asked you to be taken out of Black Box restraints while you were at UIC; correct?
> A. Yes.
> Q. Was it just five occasions where you were taken out of the cuffs at UIC or were there, you know, you go see Dr. Quigley and every time you see Dr, Quigley he says take Mr. Stewart out of the cuffs?
> A. No.

Dkt. # 407-1, pp 13-14, Dep. pp. 51-53.[9]

While neither Dr. Mesrobian or Dr. Funk ever issued plaintiff a black box exemption, other Wexford medical providers at Dixon have done so. Dr. Imhotep Carter, who succeeded Dr. Mesrobian as Dixon's medical director, approved a six month black box exemption for plaintiff on April 29, 2010. The record reflects plaintiff's grievance concerning a black box exemption had been reviewed by Dr. Carter at the request of Dr. Louis Shicker, IDOC's medical director, that Dr. Carter examined plaintiff on April 29, 2010, determined plaintiff was "qualified to have a No Black Box privilege for six months" and granted the no black box exemption the same day. (Dkt # 407-1, pp. 85, 88) Dr. Carter renewed the exemption for another six months on October 11, 2010.

Plaintiff received another black box exemption on April 25, 2011 for another six months. This black box exemption expired and plaintiff was placed in the black box restraints when out on a medical writ on May 29, 2012. Plaintiff was again given a black box exemption on February 12, 2013. This exemption was for a year. He received another year-long black box exemption on January 9, 2014 and a four month black box exemption on December 24, 2014. After May 29, 2012, plaintiff does not recall wearing the black box restraint until November 4, 2016. He recalls being placed in the black box on four occasions after November 4, 2016, including on December 6, 2016 and December 23, 2016. Plaintiff received a black box exemption again in March 2017 this time from Dr. Tim Chamberlain.

Plaintiff claims that with his preexisting shoulder, elbow, and wrist conditions wearing the black box in the twisted wrist position causes him to suffer severe pain. He argues the refusal of Mesrobian and Funk to grant him an exemption from wearing the black box when out of the prison on writs violates the Eighth Amendment because it displays deliberate indifference to the severe pain wearing the black box causes him due to his preexisting medical conditions. He also argues Wexford violated his constitutional rights because Wexford lacked adequate policies for issuing black box exemptions, had a widespread custom or practice of denying black box exemptions to inmates with medical conditions like plaintiff's, and because medical providers employed by Wexford were the ultimate decision-makers with respect to whether plaintiff received a black box exemption and those medical providers acted with deliberate indifference.

"As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial. Such a dispute exists when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which it bears

---

[9] This testimony shows only that certain UIC doctors had plaintiff taken out of the black box restraints while he was at UIC for exams. It does not show any of them, except Dr. Shaw, ever recommended plaintiff not be placed in the black box restraints at all.

the burden of proof." Grant v. Trustees of Indiana Univ., 870 F.3d 562, 568 (7th Cir. 2017) (citations and quotation marks omitted).

"Courts interpret the Eighth Amendment, as incorporated through the Fourteenth Amendment, to impose a duty on states to provide adequate medical care to incarcerated individuals. Officials violate this duty if they display deliberate indifference to serious medical needs of prisoners." McGee v. Adams, 721 F.3d 474, 480 (7th Cir. 2013) (quotation marks and citations omitted.) To survive a motion for summary judgment, plaintiff "must satisfy two elements, one objective and one subjective." Id. "To satisfy the objective element, [plaintiff] must present evidence supporting the conclusion that he had an objectively serious medical need. A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention. As for the subjective element, [plaintiff] must show that the defendants were aware of his serious medical need and were deliberately indifferent to it. Deliberate indifference is more than negligence and approaches intentional wrongdoing. To establish deliberate indifference, [plaintiff] must meet essentially a criminal recklessness standard, that is, ignoring a known risk. Even gross negligence is insufficient to impose constitutional liability." Id., at 480-81 (quotation marks and citations omitted).

"Claims of deliberate indifference to medical needs are examined differently depending on whether the defendants in question are medical professionals or lay persons." Id., at 481. Medical professionals are "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under the circumstances at issue. When a medical professional acts in his professional capacity, he may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment. Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." Id. (quotation marks, citations, and alterations omitted).

As to Dr. Mesrobian and Dr. Funk, the question then is whether plaintiff has presented evidence from which a trier of fact could find that no minimally competent medical professional would have responded as they responded under the circumstances. Was their not granting plaintiff a black box exemption such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that Dr. Mesrobian and Dr. Funk actually did not base the decision on such professional judgment at all?

Plaintiff argues that his own statements to medical staff that wearing the black box restraints caused him excruciating pain is enough to create a genuine issued of material fact as to whether he had an objectively serious medical need. He maintains that conditions that cause serious pain have been held by the Seventh Circuit Court of Appeals to be sufficiently serious for purposes of section 1983 claims and that a plaintiff's own testimony about his pain is sufficient to create a factual dispute about whether plaintiff's medical condition is serious.

7

Plaintiff contends Dr. Mesrobian, though told repeatedly by plaintiff that wearing the black box caused plaintiff extreme pain, failed to provide him a black box exemption. Plaintiff argues Dr. Mesrobian maintained "this course of treatment even though he knew that continuing to wear the black box was continuing to cause Mr. Stewart pain" and even after one of plaintiff's outside doctors at UIC recommended plaintiff be given a black box exemption. (Dkt # 421, p. 11.) Plaintiff argues that evidence that Dr. Mesrobian "engaged in a course of treatment – refusing to provide an exemption – that he knew was ineffective and was continuing to cause [plaintiff] pain that was at odds with the recommendation of [plaintiff's] outside doctor is evidence this decision was a violation of [plaintiff's] constitutional rights and not just 'an informed medical judgment' as Mesrobian claims." (Dkt # 421, p. 11.)

Plaintiff has not presented evidence, which if believed by the trier of fact, would allow a finding that Dr. Mesrobian's decision not to grant plaintiff a black box exemption was a decision no minimally competent professional would have made under the circumstances. McGee, 721 F.3d at 481. The evidence shows Dr. Mesrobian began working as the Dixon medical director in December 2008. Plaintiff went to UIC on a medical writ on January 27, 2009. During that visit, Dr. Shaw asked him how he was doing. He told Dr. Shaw he was hurting from wearing the black box. Dr. Shaw asked if there was anything he could do and plaintiff told him "help me get out of the Black Box." Dr. Shaw wrote the "to whom it may concern note" referenced above which among other things recommended "use of leather belts." At the bottom of this note, Dr. Mesrobian noted that Dr. Mesrobian discussed the request to "change to leather" with Dr. Shaw. Dr. Mesrobian's notation states "no absolute medical reason." While it is not clear whether this notation reflects what Dr. Shaw told Dr. Mesrobian or Dr. Mesrobian's own conclusion, it does show Dr. Mesrobian considered Dr. Shaw's recommendation to use leather belt restraints rather than the black box. Plaintiff has offered no evidence or explanation as to why not following a recommendation by an oncologist as to the type of restraints to use on plaintiff while transporting him was a decision no minimally competent medical professional would have made under the circumstances.

Plaintiff went to UIC on a medical writ on April 22, 2009. On April 24, 2009, he saw Dr. Mesrobian as a follow-up to his UIC visit. Dr. Mesrobian wrote in the medical records that plaintiff did not want to use the black box because he claimed it aggravated his shoulder but there was "no medical reason for no black box." On April 27, 2009, plaintiff saw a nurse for complaints of shoulder and wrist pain related to wearing the black box. The nursing notes indicate plaintiff had no injury, no swelling and no tenderness on palpitation. He was to take acetaminophen which is a pain medication. On May 5, 2009, plaintiff went to UIC on a medical writ. On May 8, 2009, he saw Dr. Mesrobian for a medical writ follow-up. Dr. Mesrobian prescribed him Motrin (one 400mg tablet three times per day) to treat the pain in his wrist and shoulders, including swelling. Plaintiff stopped taking the Motrin because he believed it was causing him abdominal cramps. Plaintiff saw Dr. Mesrobian on several other unspecified occasions and asked for a black box exemption every time he saw him. Dr. Mesrobian told him on one occasion he did not think plaintiff's injuries warranted an exemption and on another occasion that he did not think plaintiff's condition warranted an exemption.

8

This evidence does not show that no minimally competent medical professional would have made the same decisions as Dr. Mesrobian under the circumstances. Dr. Mesrobian met with plaintiff on April 24, 2009 and determined no medical reason for a black box exemption. On April 27, 2009, plaintiff was instructed to take acetaminophen by a nurse. On May 8, 2009, Dr. Mesrobian prescribed another pain reliever, Motrin, for plaintiff to treat the pain in his wrist and shoulder. Plaintiff stopped taking the Motrin because he believed it caused him abdominal cramps. There is no evidence he asked Dr. Mesrobian to prescribe another pain medication or told Dr. Mesrobian he had stopped taking the Motrin. He presents no evidence of what Dr. Mesrobian did on any of his visits with him after May 8, 2009. He only says he asked for a black box exemption and Dr. Mesrobian did not give him one. He presents no evidence that granting a black box exemption was the only action a minimally competent doctor would have taken under the circumstances faced by Dr. Mesrobian.

As to Dr. Funk, plaintiff has presented no evidence of deliberate indifference. The evidence shows Dr. Funk has no recollection of ever discussing a black box exemption with plaintiff. Plaintiff recalls discussing a black box exemption with Dr. Funk but does not recall when. The evidence plaintiff cites is his deposition testimony where plaintiff testified that it was possible he asked Dr. Funk for a black box exemption at a visit with Dr. Funk when plaintiff told Dr. Funk plaintiff wanted to see an orthopedic. When plaintiff was asked in his deposition if he remembered asking Dr. Funk for a black box exemption "at that time or any time?," plaintiff responded "It's possible if I didn't have a Black Box permit at the time." Plaintiff does not present any evidence as to what he told Dr. Funk when he discussed a black box exemption. The evidence shows Dr. Funk examined plaintiff on August 6, 2012 on a medical writ follow-up, diagnosed plaintiff with adhesive capsulitis, a possible rotator cuff tear, shoulder impingement signs and irritable bowel syndrome. Dr. Funk at that time requested plaintiff be seen by a physical therapist to evaluate and treat plaintiff's right shoulder in the hope physical therapy would reduce plaintiff's shoulder pain. (Dkt # 422-1, pp. 24-25, ¶¶ 53, 54 and responses thereto.) Dr. Funk did not believe he had seen plaintiff after this August 6, 2012 visit for any issues related to plaintiff's shoulder pain. Plaintiff presents no evidence that he saw Dr. Funk after this August 6, 2012 visit about his shoulder pain. Thus the only evidence concerning Dr. Funk and plaintiff's shoulder or wrist pain is the evidence of the visit on August 6, 2012, the diagnosis made by Dr. Funk at that visit, and Dr. Funk requesting physical therapy for plaintiff in the hope of reducing plaintiff's shoulder pain.

As noted above, plaintiff also asserts Dr. Funk was aware of plaintiff's pain and repeated requests for a black box exemption because Dr. Funk reviewed grievances at Dixon in 2017 and so would have seen plaintiff's grievances on the subject. However, as discussed above, the record plaintiff cites does not support this claim. Plaintiff has not cited evidence that shows Dr. Funk would have reviewed plaintiff's grievances in 2017.

Plaintiff also argues a reasonable jury could find Dr. Funk was deliberately indifferent because he instructed other Wexford medical staff to limit the number of black box exemptions they were providing and to only provide exemptions to inmates with broken wrists. He cites to a

9

portion of his deposition (noted above) which says nothing about broken wrists. He testifies Dr. Chamberlain told him Dr. Chamberlain did not give him a black box exemption until March 2017 "[b]ecause of his orders from Warden Steel, Dr. Funk, and Wexford." However, nothing in the cited testimony indicates what the orders from Dr. Funk that Dr. Chamberlain was referencing were. Plaintiff has failed to present any evidence from which a trier of fact could conclude Dr. Funk acted with deliberate indifference toward plaintiff.

Plaintiff claims Wexford violated his constitutional rights because it did not have adequate policies about black box exemptions, had an unconstitutional custom or practice regarding black box exemptions, and because its medical providers, who were its ultimate decision-makers, acted with deliberate indifference with respect to black box exemptions.

For Wexford to be liable, plaintiff must show Wexford had an unconstitutional policy. J.K.J. v. Polk County, 928 F.3d 576, 587 (7th Cir. 2019). "This can be done by showing either: (a) an express policy that, when enforced, causes a constitutional deprivation; (b) a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (c) that the constitutional injury was caused by a person with final decision policymaking authority." Id., at 587-88.

Wexford states its policy concerning granting black box exemptions is to leave the decision to the professional judgment of its medical professionals. Plaintiff argues this policy violated his constitutional rights because "Wexford knew or should have known that not providing sufficient guidance about when to give black box exemptions could lead to constitutional violations by its staff." Dkt # 421, p. 19. Plaintiff contends the fact Wexford has specific policies for its staff to follow covering a wide range of medical conditions shows guidance is required for its medical staff yet, when it comes to black box exemptions, it gives no guidance, leading to "Wexford's staff's repeated and unconstitutional refusal to provide [plaintiff] a black box exemption." Id. Plaintiff maintains Wexford's staff knew plaintiff had chronic painful pre-existing shoulder, elbow, and wrist conditions. He repeatedly told Wexford medical providers that he was experiencing excruciating pain from wearing the black box. Nevertheless, sometimes Wexford staff determined he qualified for an exemption and sometimes they did not.

Forcing prisoners to wear the black box restraints while outside prison does not, in itself, violate the Eighth Amendment. See Stewart v. Special Administrator of Estate of Mesrobian, 559 Fed. Appx. 543 (7th Cir. 2014), citing, Fulford v. King, 692 F.2d 11, 14-15 (5th Cir. 1982). Pursuant to IDOC policies, black box restraints are used on all inmates who leave Dixon unless the inmate has a medical exemption. Wexford, as the contract medical services provider at Dixon, leaves the decision whether to give an inmate a black box exemption to the professional judgment of its medical staff. It is a clinical decision based on the individual patient, the patient's circumstances, and medical necessity. Plaintiff has not presented any evidence that shows this policy is unconstitutional.

10

Plaintiff's argument is that because different doctors at different times reached different conclusions about whether plaintiff should receive a black box exemption, the policy allowing this exercise of clinical judgment was, itself, deliberately indifferent. He contends lack of guidance to Wexford's medical staff about which conditions warranted a black box exemption led to his inconsistent treatment.

In Glisson v. Indiana Department of Corrections, 849 F.3d 372, 375-76 (7th Cir. 2017), on which plaintiff relies, the question before the court was whether "because of a deliberate policy choice pursuant to which no one was responsible for coordinating [the plaintiff's] overall care, [the defendant] itself violated Glisson's Eight Amendment rights." The court held a jury could find that the decision of Corizon, the contract medical provider to the Indiana Department of Corrections (INDOC), not to adopt protocols for the coordinated care of chronically ill inmates was deliberately indifferent. Id., at 382. In so ruling the court observed that INDOC had Chronic Disease Intervention Guidelines which prison health care providers were required to implement and which specifically mandated "a treatment plan for chronic cases – both an initial plan and one that is updated as care needs change." Id., at 380. "One does not need to be an expert to know that complex, chronic illness requires comprehensive and coordinated care" and that the Constitution requires such a medical provider "to ensure that a well-recognized risk to a defined class of prisoners not be deliberately left to happenstance. Corizon had notice of problems posed by a total lack of coordination. Yet despite that knowledge, it did nothing for more than seven years to address that risk." Id.

The situation here is distinguishable from Glisson. In Glisson, the lack of coordinated care among the various Corizon staff members led to lack of proper treatment leading to Glisson's death. The court held Corizon's decision not to have a coordinated plan could be found by a jury to have been deliberately indifferent to Glisson's serious medical needs. In contrast, here, there is no evidence any member of Wexford's medical staff who treated plaintiff was unaware of plaintiff's medical conditions nor of his claim that wearing the black box restraints caused him severe pain. The evidence presented in this case shows the medical staff members plaintiff asked for a black box exemption evaluated plaintiff's request in light of his medical conditions and exercised their professional judgment in either granting or denying the request. Plaintiff may be dissatisfied with some of the decisions made by Wexford's staff members but he has not offered any evidence that a policy allowing the exercise of professional medical judgment in determining whether to grant black box exemptions is, itself, a violation of plaintiff's Eight Amendment rights.

Plaintiff also claims Wexford had an unconstitutional custom or practice to not give black box exemptions to inmates with conditions like plaintiff's. Plaintiff's argument in support of this claim is simply that there were times he was denied a black box exemption. However, as discussed above, the evidence shows that times he was denied an exemption were the result of the exercise of professional medical judgment. He has no evidence, beyond his own experience of sometimes being denied an exemption, to support his claim of a custom or practice to deny black box exemptions. His own experience, in which the exercise of professional medical

judgment resulted in him often obtaining black box exemptions and sometimes being denied the exemptions, is not evidence of a custom or practice to deny such exemptions. Plaintiff presents no other evidence of a custom or practice of denying black box exemptions for reasons other than the professional medical determination that an exemption was not warranted under the circumstances.

Plaintiff also argues Wexford is liable because its medical providers were persons with final decision policymaking authority for Wexford on the issuance of black box exemptions. This is incorrect. "The discretionary decisions of an employee without policymaking authority are insufficient to establish § 1983 liability." Chortek v. City of Milwaukee, 356 F.3d 740, 749 (7th Cir. 2004). Wexford "is not liable merely because the official who inflicted the alleged constitutional injury had the discretion to act on its behalf; rather, the official in question must possess final authority to establish [official] policy with respect to the challenged action." Id., quoting Fiorenzo v. Nolan, 965 F.2d 348, 351 (7th Cir. 1992). There is no evidence any of the medical staff had final authority to establish Wexford's policy on granting or denying black box exemptions. The evidence shows they were merely operating under that policy which was to allow the medical staff to decide whether an exemption for any given inmate was warranted under the circumstances.

Plaintiff has failed to present sufficient evidence to permit a trier of fact to make a finding in his favor on his claims against Wexford, Dr. Funk, and Mr. Blickenstaff, in his capacity as personal representative of the Estate of Antreas Mesrobian, M.D.[10] Accordingly, the motion of these defendants for summary judgment [406] is granted. Judgment is entered in favor of defendants Kenneth Blickenstaff, in his capacity as personal representative of the Estate of Antreas Mesrobian, M.D., deceased, Arthur Funk, M.D., Wexford Health Sources, Inc. and against plaintiff.

Date: 9/10/2019　　　　　　　　　　ENTER:

*Philip G. Reinhard*

United States District Court Judge

Electronic Notices. (LC)

---

[10] Because the court finds plaintiff has failed to present sufficient evidence to survive summary judgment, it is unnecessary for the court to address the evidence concerning the affirmative defenses raised by Wexford, Dr. Funk and Mr. Blickenstaff.